690 So.2d 449 (1995)
Betty Woods WILSON
v.
STATE.
Betty Woods WILSON
v.
STATE.
CR-92-1223, CR-93-2132.
Court of Criminal Appeals of Alabama.
January 13, 1995.
Rehearing Denied May 5, 1995.
*451 Jack Drake, Tuscaloosa; Paul M. Sandlin, Huntsville, Charles Hooper, Huntsville; and Bobby Lee Cook, Summerville, GA, for appellant.
James H. Evans, Atty. Gen., Margaret Childers, Asst. Atty. Gen., for appellee.
TAYLOR, Judge.
The appellant, Betty Woods Wilson, was convicted of hiring someone to kill her husband, Dr. Jack W. Wilson, a Huntsville ophthalmologist, an offense made capital because the murder was "done for a pecuniary or other valuable consideration or pursuant to a contract or for hire." § 13A-5-40(a)(7), Code of Alabama 1975. The appellant waived the jury's participation in the penalty phase of the capital trial and the state recommended that Wilson be sentenced to life without parole. The court accepted the state's recommendation and sentenced the appellant to life imprisonment in the penitentiary without the possibility of parole.
This case was originally submitted to this court after oral argument in February 1994. Before a decision in this case could be released, the appellant filed a petition for post-conviction relief pursuant to Rule 32, Ala. R.Crim.P., collaterally attacking her conviction and sentence. When that petition was filed, submission of the direct appeal in this case was set aside until the trial court acted on the post-conviction petition. The trial court denied the petition in September 1994. A briefing schedule was set for appeal from the post-conviction petition and this case was resubmitted to this court on December 12, 1994. This is one of the reasons for the delay in this case.
This opinion consolidates the appeals from both the appellant's conviction of the crime of capital murder and the court's denial of her petition for post-conviction relief.
The state's evidence tended to show that the body of Dr. Jack Wilson was found in his home on Boulder Circle in Huntsville, Alabama, on May 22, 1992.[1] He had been severely beaten around the head, arms, and hands and had been stabbed twice in the chest. A bloody baseball bat was found approximately five feet from the body.
Dr. Wilson died leaving an estate valued at approximately $6,300,000. The terms of Dr. Wilson's will provided that the majority of his estate would go to his wife, the appellant, Betty Woods Wilson.
Dr. Joseph Embry, forensic pathologist for the Alabama Department of Forensic Sciences, testified that Dr. Wilson died as a result of injuries caused by the beating to his head and the stab wounds to his chest. He further testified that there were nine lacerations on Dr. Wilson's head. The lacerations ranged in size from 7/8 of an inch to 2― inches in length. It was Dr. Embry's opinion that the lacerations were consistent with wounds that would be caused by a baseball bat.
At the time of appellant Wilson's trial, James Dennison White was under indictment for the murder of Dr. Wilson. White, pursuant to a plea agreement, testified that he was hired by appellant Wilson and her sister, Peggy Lowe, to kill Dr. Wilson. He said that he met Lowe at his daughter's school in Vincent, Alabama, where he often did carpentry work. Their friendship developed after he did some carpentry work for Lowe, and they frequently talked on the telephone. White said that one of the reasons he committed the murder was to win Lowe's affection. *452 White said that Lowe once told him while they were talking on the telephone that she loved him. Lowe told White that she had a friend who was in a bad marriage and whose husband mistreated her. She told him that this friend wanted to get rid of her husband. White learned in March 1992 that this friend was in fact Lowe's sister, Betty Woods Wilson. White told Lowe that he had "connections" and could arrange for the murder of Dr. Wilson. Between late March 1992 and early April 1992, Lowe and White discussed having Wilson's husband killed. He testified that they agreed upon a price of $5,000. He said that Peggy Lowe called him later in April to tell him that her sister had given her one-half of the money to give to him.
White said that after he received the money he paid some past due utility bills, deposited $500 in his bank account which had been overdrawn by over $400, and spent the remaining money on his four children. By the end of April he had spent the money. The reason that White was in financial difficulty, he said, was because he had injured his right ankle and left knee at a previous job. White testified that he had an eighth grade education, that he had been married four times, and that he had drug and alcohol problems.
White testified that Lowe started pressuring him to murder Dr. Wilson after he had sexual intercourse with her on May 15, 1992. Lowe told him that if he did not murder Dr. Wilson, she would have to repay her sister. He stated that he told Lowe that in order to go to Huntsville to commit the murder he needed more money because he had spent the $2,500 she had given to him in April. Lowe told him to go to Lake Guntersville State Park and get some money from appellant Wilson who was at an Alcoholics Anonymous "AA" meeting. Lowe told him to go to Wilson's car, a black BMW, which would be parked near the entrance to the park and retrieve a book entitled The Sleeping Beauty and the Firebird. The car would be unlocked and the book would be on the back seat. The book, about a ballet, would have money in it to finance his trip to Huntsville to murder Dr. Wilson.
White arrived at Lake Guntersville State Park on the evening of May 16, 1992, but the security guard at the entrance gate would not let him enter. He told the guard that he needed to retrieve a book from appellant Wilson's car and that he had come a long distance to get it. The guard told him that he could try to contact Wilson on a pay telephone located at a service station several miles from the park entrance. White went to the pay telephone and called Lowe. Lowe told him to call the front desk at the lodge to try and locate her sister. White left a message for appellant Wilson at the front desk. He then waited by the front entrance and one of the guards brought the book to him. He testified that after he got the money and the book, he went to Huntsville and drove past the Wilson house and then returned to his trailer in Vincent.
White testified that not more than two days after May 16, he received a telephone call from Wilson. Appellant Wilson asked him what was "going on" and why he had not committed the murder. She also told him that she wanted Dr. Wilson murdered before May 24, because she did not want to go on their planned vacation with him.
White said that he was unable to get cartridges for his gun. On May 20, 1992, Lowe telephoned him and said that she had the "tool and equipment to do the job." He said that he met appellant Wilson and Lowe at Logan Martin Dam. They were in appellant Wilson's black BMW. Lowe got out of the BMW holding a sweater in her hand. She opened one of the doors to his truck and dropped a .38 caliber revolver, which had been wrapped in the sweater, on the seat. White went back to his trailer, wrapped the gun in a towel, and hid it under some boards behind his trailer.
White stated that he was told that he would receive a telephone call telling him when to commit the murder. Early in the morning of May 21, 1992, he received a telephone call from the appellant. He said that he went to Dr. Wilson's office but decided not to kill him there because there were too many people around. He went to a pay telephone near the office, telephoned Lowe, and talked to appellant Wilson, who was *453 staying at Lowe's house. He told her that he needed some money so that he could spend the night in Huntsville. He said that appellant Wilson told him to meet her at the Chick-Fil-A restaurant at Parkway City Mall in Huntsville around 12:00 that day and that she would give him some money. White said that he stood in line at the Chick-Fil-A restaurant, was waited on by a girl named Christina, got a sandwich, walked outside, and sat down on one of the benches. Wilson also went through the line in the restaurant, walked outside, and handed him a bag that contained an $100 bill.
White then went to K-Mart, purchased a travel kit and some underwear, so that he could spend the night in Huntsville. He then checked into a Ramada Inn. He decided to drive by the Wilson house to "check the layout" of the property. He said that he tried to act like a jogger, although he was dressed in jeans. While he was in the Wilsons' neighborhood he saw a neighbor of the Wilsons doing yard work. He returned to the hotel and called Lowe. The following morning appellant Wilson telephoned him. White told her that she would need to drive him to their house so that no one would see him.
He testified that appellant Wilson met him at the Parkway City Mall around 3:00 p.m. on Friday, May 22, 1992. As he got out of his car to get in her BMW, he saw that she was wearing flowered tennis shoes. He got down on the floor of her car and she drove him to her house. When they pulled into the garage, she handed him $40 and told him where her husband's bedroom was located. Dr. Wilson was not home at this time. White testified that he decided not to use the gun and instead took along some rope. He said that he stayed in the house for what he believed to be several hours waiting for Dr. Wilson to arrive. As he was walking on the landing of the stairs he came face-to-face with Dr. Wilson. They wrestled, he knocked Dr. Wilson down, and he grabbed an object that he later said that he could not identify and started beating Dr. Wilson with it. He testified that after this he "blanked out" and the next thing he remembers is finding himself behind the Wilson house in the woods. He buried a bag containing some clothes in the woods, went back to the house, and had appellant Wilson drive him to his car, which was parked at the mall.
The remaining $2,500 was to be left in Lowe's garage on the Sunday after the murder. He said he went to Lowe's house to get the remaining $2,500, but found no money in the garage.
Numerous witnesses corroborated various details of James White's testimony. Testimony was presented that corroborated his testimony that he received money in April to commit the murder. There was testimony that White, who had no steady job and had had no money for quite some time, had a great deal of money immediately before Dr. Wilson's murder. Linda Bush, head teller at First Bank of Childersburg, testified that on April 27, 1992, White deposited $500 to his checking account. He also made payments on some loans and bought two money orders. In all, he gave Bush over $1,000 in cash. Bush further stated that at the time he conducted the above banking transactions with her as the teller, she noticed that he had some money in his hand wrapped in a money wrapper indicating that it was $1,000. She further testified that James White had made no deposits to his account from January 22, 1992, to April 27, 1992. At the time of his April 27 deposit his account had a deficit balance of over $400.
Shirley Smith, the owner of Smith Grocery store in Vincent, Alabama, where White lived, testified that two weeks before May 22, White came into her store and paid her the amount of two of his checks that had been returned to her marked "insufficient funds."
The state also presented evidence that corroborated James White's testimony that appellant Wilson was unhappy in her marriage and that she wanted Dr. Wilson murdered. There was testimony that the marriage had deteriorated. Appellant Wilson and Dr. Wilson had separate bedrooms, and appellant Wilson had had several extra-marital affairs, one as recently as two weeks before Dr. Wilson's murder. JoAnn Chiri, a technician who worked in Dr. Wilson's office, testified that appellant Betty Wilson was unkind to her husband and that she had made the *454 statement that she would rather be a well respected widow than a divorcee.
E.F.[2] testified that he met appellant Wilson at an AA meeting and that they had an affair. He testified that they frequently met at hotels but that they had also met at the Wilson house.
M.A.L., a former friend whom appellant Wilson had met through AA, testified that she ended her friendship with appellant Wilson after she learned that she was using her as an alibi when Wilson went to New York City to meet another man.
Brenda McDowell, Dr. Wilson's bookkeeper, testified that she once saw Wilson in the midst of a rage against Dr. Wilson and that Wilson told her to give Dr. Wilson a "message"; she then made an obscene hand gesture.
Shirley Green, the Wilsons' housekeeper at the time of the murder, testified that the Wilsons slept in separate bedrooms, that appellant Wilson made many derogatory remarks about Dr. Wilson, and that she referred to a colostomy bag Dr. Wilson wore as a result of surgery as his "shit bag." Appellant Wilson told the housekeeper that there were many things about Dr. Wilson that she did not like. She further testified that appellant Wilson frequently had male visitors at the Wilson house.
There was testimony that Wilson had previously inquired about hiring someone to kill Dr. Wilson in 1986. Brenda Cerha testified that appellant Wilson asked her about hiring someone to kill Dr. Wilson. Cerha became friends with Wilson after Cerha married Dr. Wilson's best friend. Cerha's husband committed suicide in 1986. Shortly after Cerha's husband's death in March 1986, appellant Wilson asked Cerha if she killed her husband. Cerha testified that appellant Wilson then stated to her: "I want to kill Jack. Will you help me and do you know how we can do it?" She testified that after this conversation with Wilson, their friendship deteriorated.
There was testimony that corroborated White's account of the occurrences at Lake Guntersville State Park. Keith Tucker, a security guard at the park, testified that on May 16, 1992, White came to the entrance gate and wanted to get a book from appellant Wilson's car. Tucker told him to go to a pay telephone and contact Mrs. Wilson through the front desk at the lodge. Robert Hawkins, another security guard at Lake Guntersville State Park, testified that he accompanied appellant Wilson to her black BMW to get the book. The car was unlocked and the book was in the back seat. Hawkins delivered the book to the appellant, who was waiting at the entrance gate. Similar testimony was given by David Stork, who worked at the front desk of the lodge at Lake Guntersville State Park. Telephone company records confirmed that on May 16, 1992, a 10-minute telephone call was made to Lowe's house from a pay telephone at a store about three miles from the entrance gate to Lake Guntersville State Park.
Other witnesses corroborated many other details of White's testimony. Ron White, manager of Chick-Fil-A restaurant at Parkway City Mall where James White said he ate on the day before the murder, testified that on May 21, 1992, an employee by the name of Christina was working at the food counter.
Vince Caruso, an associate at Camelot Music at Parkway City Mall, testified that on May 21, 1992, appellant Wilson bought two compact discs. The store was a two-minute walk from the Chick-Fil-A restaurant.
Karen James, an employee of K-Mart in Huntsville, testified that at 12:24 on May 21, 1992, an individual purchased aftershave lotion, a travel kit, and some men's underwear, and paid for the purchase with a $100 bill.
Gary Houck, manager of Ramada Inn, at which White said he spent the night, testified that James White stayed at the Ramada Inn the evening of May 21, 1992, that he paid cash for the room, and that he made several telephone calls from his room. Telephone records confirmed that White called Lowe. At 5:49 p.m. a one-minute call was made to *455 Lowe's house, and at 8:03 p.m. a six-minute call was made to Lowe's house.
Jim Garrett, a neighbor of the Wilsons, testified that on May 21, at 4:00 p.m., he saw a man, appearing to be a jogger, wearing jeans, go by the Wilson house and stop in front of it.
Mavis Kennedy, Peggy Lowe's next door neighbor, testified that on Sunday, May 24, two days after the murder, she saw White in the Lowe's garage.
A book from a public library was in White's possession at the time of his arrest. It had been checked out of the library by Betty Wilson. The name of the book was The Sleeping Beauty and the Firebird. Police testified that appellant Wilson's gun was found near White's trailer in the place he told police to look for it.
Witnesses testified as to Wilson's conduct on the day of the murder. Peter Coulter, shoe manager at Yeildings department store in Parkway City Mall, testified that on May 22, 1992, at 2:11 p.m., appellant Wilson bought a pair of flowered tennis shoes. JoAnn Williamson testified that appellant Wilson came to her office around 4:00 p.m. to pick up a check. David Williams, a clerk at Whitesport Pharmacy, testified that appellant Wilson was there at 4:30 p.m. to get some prescriptions filled.
Sheila Irby, a neighbor of appellant Wilson's, testified that she saw a man she identified as White limping in the direction of the Wilson house around 5:00 p.m. Irby further testified that she saw appellant Wilson driving toward her house, she thought, at around 5:15 p.m.
N.N., a close friend of Wilson's through their meetings at AA, testified that she called appellant Wilson to see if they could meet earlier than the time that they had arranged to meet that day. Appellant Wilson declined, telling her that she had some shopping to do. N.N. told Wilson that she would like to go shopping with her. Appellant Wilson told her that she would just see her at the meeting around 5:30 p.m.
Belinda Schumann, an acquaintance of appellant Wilson's, testified that Wilson drove her car out of a parking space at the building at which the AA meetings were held at 5:25 p.m. Witnesses testified that Wilson did not arrive at the AA meeting until 6:00 p.m. and that she was not in her usual attire. Appellant Wilson normally "dressed up" for AA meetings, but on that day she was dressed casually and wearing flowered tennis shoes.
Appellant Wilson's defense was that she was trying to help White get into AA. Peggy Lowe testified that the occurrences at Lake Guntersville State Park merely constituted an effort by appellant Wilson to try to give money to White so that he could come to the AA meeting at Lake Guntersville State Park and spend the weekend.

I
Wilson initially contends that there was not sufficient evidence presented to corroborate the testimony of James Dennison White. According to § 12-21-222, Code of Alabama 1975, White's testimony must be corroborated before appellant Wilson could be convicted of capital murder. § 12-21-222 states:
"A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
Wilson was convicted of capital murder pursuant to § 13A-5-40(a)(7), Code of Alabama 1975, i.e., murder "done for a pecuniary or other valuable consideration or pursuant to a contract or for hire." The corroborative evidence in this case would need to be directed to corroborating the murder for hire aspect of this case, not the actual killing. No one has ever alleged or claimed that Betty Woods Wilson actually bludgeoned and stabbed Dr. Wilson herself.
The state's theory of this case was that appellant Wilson planned the crime, procured and paid someone to carry out the plan, and facilitated the commission of the crime. The charge is murder for hire. The appellant's alleged participation in the crime consisted of procuring and paying someone else to commit *456 the act. We will address the true issue of corroboration, or lack of corroboration, as to her participation. At issue here is whether the state presented sufficient evidence to corroborate White's testimony that he had an agreement with and was paid by the appellant to murder her husband, Dr. Jack Wilson.
Initially, we observe that this court, in reviewing the "sufficiency of the evidence," must view the evidence in the light most favorable to the state. Franklin v. State, 629 So.2d 759 (Ala.Cr.App.1993); Wells v. State, 619 So.2d 228 (Ala.Cr.App.1993).
We here set out the law concerning corroborative evidence as previously quoted in our cases:
"The test for determining the sufficiency of the corroborative evidence of the testimony of an accomplice is through a `subtraction process.' The test is generally stated:
"`(F)irst, the evidence of the accomplice must be eliminated, and then, if upon examination of all other evidence, there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense, there is sufficient corroboration....'"
McCoy v. State, 397 So.2d 577, 585 (Ala.Cr. App.), cert. denied, 397 So.2d 589 (Ala.1981).
As further stated in Chevere v. State, 607 So.2d 361 (Ala.Cr.App.1992):
"`"[C]orroborative evidence need not refer to any statement or fact testified to by the accomplice. Neither must it be strong nor sufficient of itself to support a conviction. The probative value of the evidence need only legitimately tend to connect the accused with the crime and need not directly do so. Further, corroborative evidence need not directly confirm any particular fact nor affirm each and every material fact testified to by the accomplice. Corroboration may be proven by circumstantial evidence alone."
"`Mills v. State, 408 So.2d [187] at 191 [Ala.Cr.App.1981)].
"`"The entire conduct of the accused may be surveyed for corroborative circumstances and if from them his connection with the offense may be fairly inferred the requirement of the statute is satisfied. 2 Wharton's Criminal Evidence, § 746.'
"Colvette [v. State], 568 So.2d [319] at 321-22 [(Ala.Cr.App.1990)], quoting Moore v. State, 30 Ala.App. 304, 307, 5 So.2d 644, 645 (1941), cert. denied, 242 Ala. 189, 5 So.2d 646 (1942).
"`Corroborate' is defined as to `strengthen; to add weight or credibility to a thing by additional and confirming facts or evidence.' Black's Law Dictionary 344 (6th ed. 1990). The evidence presented in corroboration does not have to be enough standing alone to result in a conviction. The corroborating evidence need not be `strong.' Andrews v. State, 370 So.2d 320, 322 (Ala.Cr.App.), cert. denied, 370 So.2d 323 (Ala.1979). See also Reed v. State, 407 So.2d 153 (Ala.Cr.App.1980), rev'd on other grounds, 407 So.2d 162 (Ala.1981).
"Section 12-21-222, `[d]oes not require corroborative testimony as to material elements of the crime....' Ex parte Bell, 475 So.2d 609, 613 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985), but, the corroborative evidence must `tend to connect the defendant with the commission of the crime.' § 12-21-222, Code of Alabama 1975. `The corroboration of an accomplice may be shown by circumstantial evidence.' Kuenzel v. State, 577 So.2d 474, 515 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991)".
607 So.2d at 365-66. Further, "`[a] combination of facts may be sufficient to corroborate the testimony of an accomplice even though each single fact, standing by itself, is insufficient.' Jackson v. State, 534 So.2d 689, 691 (Ala.Cr.App.1988)." Blankenship v. State, 589 So.2d 1321, 1324 (Ala.Cr.App.1991).
Looking at the combination of the evidence set out above, we hold that there was sufficient evidence corroborating the testimony of the alleged accomplice White to connect Betty Woods Wilson to the crime of murder for hire.
*457 White testified that he had been instructed by Wilson's sister that Wilson would give him some money necessary to cover his expenses in committing the murder by leaving it in a book on the back seat of Wilson's car, which would be parked at Lake Guntersville State Park. He further testified that when he attempted to retrieve the book from the car, guards at the park would not allow him to enter the premises. White contacted Wilson's sister and then telephoned the front desk at the Lake Guntersville State Park Lodge and left a message for Wilson that he was in need of the book that she had. Thereafter, a guard brought the book to White at the park gate.
The state presented evidence corroborating White's testimony regarding what happened at the park. Keith Tucker, a security guard at the entrance to the park, testified that White did in fact attempt to enter the park to retrieve a book from Wilson's car. Tucker would not allow White to enter the park but told him he could telephone the lodge from a pay telephone at a gas station a few miles down the road. Telephone records showed that a collect telephone call was made to appellant Wilson's sister's residence from a Union 76 Station approximately three miles from the park entrance. Robert Hawkins, a security guard inside the lodge, testified that he received a message to contact Wilson and inform her that someone at the gate needed a book that she had. After finding Wilson, he accompanied her to her car, where she retrieved the book. He then carried the book to the gate and gave it to White.
Wilson's participation in the murder was that she paid White to murder her husband. White testified to the events surrounding the payment of expense money by appellant Wilson. The testimony of the guards at the park and the telephone records corroborate White's testimony that Wilson paid him to murder her husband.
Additionally, evidence was presented that Wilson, six years before the murder, had told Brenda Cerha that she wanted to kill her husband. This comment was not a single, isolated incident. When considered in conjunction with the other evidence presented and with other comments made by the appellantâ i.e., that she would rather be a widow than a divorceeâ it is clear that the appellant had a continuing desire to rid herself of her husband.
Furthermore, there was testimony that White had in his possession a considerable sum of cash, at least $2,000, around the time White testified he was first paid $2,500 cash by Wilson to kill her husband. This evidence alone does not prove that he received that money from Wilson; however, when considered in relation to the other evidence, it supports White's testimony that he was paid to murder Dr. Wilson. Considering Wilson's desire to rid herself of her husband, it is legitimate to infer that White obtained the money from Wilson.
As we have previously stated, corroborative evidence does not have to be so strong or sufficient as to support a conviction; it must only connect the accused to the commission of the crime. Chevere, supra. The corroborative evidence detailed above in the facts was sufficient to connect appellant Wilson to the crime of hiring someone to kill Dr. Wilson.

II
Wilson also contends that the court erred in denying her motion based on the United States Supreme Court's holding in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). In Batson, the United States Supreme Court held that the Equal Protection Clause prohibits the prosecution from exercising its peremptory strikes to remove blacks from a black defendant's jury solely on the basis of their race. In Powers v. Ohio, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the Court extended its decision in Batson to the striking of blacks from a white defendant's jury. Batson was further extended to apply to civil cases in Edmonson v. Leesville Concrete Co., 500 U.S. 614, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991). The United States Supreme Court in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), held that the protections of Batson were also available to defense counsel in criminal trials. The Alabama Supreme Court, in White Consolidated *458 Industries, Inc. v. American Liberty Insurance Co., 617 So.2d 657 (Ala.1993), further extended the applications of Batson to the striking of white veniremembers. Batson has also been extended to prohibit gender-based strikes. J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).
Specifically, Wilson contends that the court erred in holding that she did not present a prima facie case of racial discrimination. We will reverse a trial court's ruling on a Batson motion only when that ruling is clearly erroneous. Ex parte Branch, 526 So.2d 609 (Ala. 1987).
"A defendant claiming a Batson violation must make a prima facie showing that the prosecution used its peremptory strikes in a discriminatory manner. Jackson v. State, 594 So.2d 1289 (Ala.Cr.App.1991). Only when the defendant establishes facts and circumstances that raise an inference of discrimination must the state give its reasons for its peremptory strikes. Carter v. State, 603 So.2d 1137 (Ala.Cr.App. 1992)."
Stokes v. State, 648 So.2d 1179, 1180 (Ala.Cr. App.1994).
A review of the record reveals that the venire included 94 members, 15 of whom were black. Of the state's 41 peremptory challenges, 9 were used to remove black veniremembers. The defense used two of its strikes to eliminate black veniremembers.
The only basis that Wilson gave for her Batson claim was that the state struck 9 of the 15 black veniremembers. The court twice asked the appellant, "Anything else?" before stating that it did not believe that the appellant had presented a prima facie case of discrimination. Thereafter, the state responded to the appellant's motion, arguing that the appellant had not established a prima facie case of discrimination. The court then overruled the appellant's Batson motion.
"In determining whether there is a prima facie case, the court is to consider `all relevant circumstances' which could lead to an inference of discrimination. See Batson, 476 U.S. at 93, 106 S.Ct. at 1721, citing Washington v. Davis, 426 U.S. 229, 239-42, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976). The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
"1. Evidence that the `jurors in question share[d] only this one characteristicâ their membership in the groupâ and that in all other respects they [were] as heterogeneous as the community as a whole.' [People v.] Wheeler, 22 Cal.3d [258] at 280, 583 P.2d [748] at 764, 148 Cal.Rptr. [890] at 905 [(1978)]. For instance `it may be significant that the persons challenged, although all black, include both men and women and are [of] a variety of ages, occupations, and social or economic conditions,' Wheeler, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.
"2. A pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723.
"3. The past conduct of the state's attorney in using peremptory challenges to strike all blacks from the jury venire. Swain [v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)].
"4. The type and manner of the state's attorney's questions and statements during voir dire, including nothing more than desultory voir dire. Batson, 476 U.S. at 97, 106 S.Ct. at 1723; Wheeler, 22 Cal.3d at 281, 583 P.2d at 764, 148 Cal.Rptr. at 905.
"5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions. Slappy v. State, 503 So.2d 350, 355, (Fla.Dist.Ct.App.1987); People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal. Rptr. 656 (1986); People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890 (1978).
"6. Disparate treatment of members of the jury venire with the same characteristics, or who answer a question in the same or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher *459 was not challenged. Slappy, 503 So.2d at 352 and 355.
"7. Disparate examination of members of the venire; e.g., in Slappy a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
"8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. Batson, 476 U.S. at 93, 106 S.Ct. at 1721; Washington v. Davis, 426 U.S. at 242, 96 S.Ct. at 2049.
"9. The state used peremptory challenges to dismiss all or most black jurors. See Slappy, 503 So.2d at 354, Turner, supra."
Branch, 526 So.2d at 622-23. See also, Harrell v. State, 555 So.2d 263 (Ala.1989).
Wilson's sole basis for her contention that the state used its peremptory strikes in a discriminatory manner was that the state struck 9 of 15 black veniremembers. The state had to strike 41 of the 94 veniremembers in order to reduce the venire to a 12-member jury. The state used fewer than 22% of its strikes to remove members of the venire who were black. Cf. Ex parte Thomas, 659 So.2d 3 (Ala.1994) (holding that the use of a large percentage of strikes to remove blacks from a jury presents a prima facie case of discrimination).
The mere fact that blacks are struck from a venire does not present a prima facie case of racial discrimination. Harrell v. State, 571 So.2d 1270 (Ala.1990), cert. denied, 499 U.S. 984, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991). A review of the record of the entire jury selection process does not reveal any evidence that the state exercised its peremptory strikes in a discriminatory manner. The court's holding that the appellant did not present a prima facie case of racial discrimination was not erroneous.

III
The appellant next questions Sheila Irby's testimony on three grounds. Initially, the appellant contends that the court erred in failing to strike Irby's identification testimony.
Sheila Irby testified that she saw a man she identified as James White walking away from Wilson's house between 4:45 and 5:00 p.m. on May 22, 1992. Irby also testified that she saw Wilson driving toward her home in a black BMW between 5:10 and 5:15 p.m. that same day. Wilson alleges that Irby's identification occurred only after she had been exposed to extensive pretrial publicity in Huntsville and to suggestive remarks by District Attorney Jimmy Fry. Wilson also alleges that Irby's identification makes no sense factually when compared to the other evidence in the case.
Initially, we observe that appellant Wilson failed to object to Irby's identification when it was offered during direct examination. The appellant did not object until an in camera conference was held during the cross-examination of Irby. In Douglas v. State, 629 So.2d 770, 771 (Ala.Cr.App.1993), this court stated:
"However, the appellant's trial counsel failed to object to the pre-trial and in-court identifications until after the close of the state's case-in-chief, when he filed his motion to exclude. Trial counsel made no objection when the evidence was offered, and thus failed to preserve any error for this court's review. This court has stated: `A motion to exclude ... is not sufficient to preserve the issue where no timely objection was made at the time the evidence was offered and admitted.' Newsome v. State, 570 So.2d 703, 717 (Ala.Cr.App. 1989). The appellant's motion to exclude was untimely. See Morgan v. State, 589 So.2d 1315 (Ala.Cr.App.1991); Fantroy v. State, 560 So.2d 1143 (Ala.Cr.App.1989)."
However, even if this issue had been preserved, the evidence tended to show that Irby's identifications did not violate the standard set out by the United States Supreme Court in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The Court set forth five factors to be considered: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the *460 criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. Neil, 409 U.S. at 199, 93 S.Ct. at 382, 34 L.Ed.2d at 411.
With regard to Irby's identification of White, she testified that she was driving her daughter and other 10- and 11-year-old girls to her house between 4:45 and 5:00 p.m. She testified that the girls had to be at a softball game at 5:00 p.m., so she was taking them to her house to change into their uniforms. On the way there, she saw a man limping on Boulder Circle, traveling away from the Wilson residence. She testified that the man "obviously did not belong in the neighborhood." All of the young girls in the car were joking about how strange he looked. Irby testified that she thought he might have been some kind of worker, but she did not see any sort of work trucks or vehicles nearby. She said something "just wasn't right" about the situation and she thought about stopping. However, she needed to get the girls to her house, so she did not stop.
After she took the girls to the ballpark at 5:00 p.m., she drove back to her house between 5:10 and 5:15 p.m. so she could change clothes. Irby testified that around that time she saw Wilson driving a black BMW. She also said that she had seen appellant Wilson on the road several times that day. She knew Wilson's face because they had attended high school together. Additionally, Irby testified that she knew Wilson's face from living in the same neighborhood.
Sometime after the murder Irby mentioned to a neighbor that she had seen a strange man on Boulder Circle on May 22, 1992. Irby testified that she told the neighbor that Irby did not need to call the police or the district attorney because she thought the man had already confessed. However, the neighbor called District Attorney Jimmy Fry. Irby then relayed what she had seen to Mr. Fry and to Investigator Brantley of the Huntsville Police Department.
The record reflects that Irby's identifications were reliable and did not violate Neil v. Biggers. The trial court correctly received them into evidence.
Wilson further contends that the trial court erred by not allowing her to play for the jury a tape-recorded conversation between Sheila Irby and Charlie Hooper (one of appellant Wilson's attorneys).
The appellant wanted to use the recording to attempt to impeach Irby during her cross-examination with proof of a prior inconsistent statement. The tape was played outside the presence of the jury, and the trial court ruled that the tape could not be played for the jury in its entirety.
"When a witness, on cross-examination, denies that he made a statement out of court which is inconsistent with his testimony on direct examination, the only available move for the impeaching party is to bring on an impeaching witness who can testify as to the prior inconsistent statement of the witness being impeached. Before such extrinsic evidence may be elicited, however, it is the general rule that the impeaching party must lay a proper predicate by asking the party being impeached whether he made such a statement, specifying with reasonable certainty the time when, the place where, the person to whom such supposed statement was made and the substance of such a statement.
"This rule is equally applicable to preclude the interrogation of a witness on cross-examination as to statements made out of court contrary to his direct testimony unless such a predicate, as described above, is laid as to such prior inconsistent statements."
C. Gamble, McElroy's Alabama Evidence, § 157.01(1) (4th ed. 1991).
The record reflects that the appellant did not lay the correct predicate to introduce the tape as impeachment evidence. The appellant never proved that Irby made any prior inconsistent statements; therefore, there was no reason to allow Wilson to impeach her testimony.
However, the trial court allowed the tape to be received into evidence for the limited purpose of impeaching Irby. The trial court ruled only that the tape could not be played in its entirety. Thereafter, Wilson could have played any parts of the tape that supposedly *461 revealed prior inconsistent statements, but she made no attempt to do so. Instead, Wilson read extensively from the transcript of the tape in an attempt to impeach Irby. Almost the entire content of the tape was read into the transcript, thereby essentially enabling Wilson to get what she wanted into evidence. Irby readily admitted that she had said what was on the tape. Again, no prior inconsistent statements were proven to exist. The appellant was given her right to a full cross-examination of Irby. We hold that the trial court did not err in its ruling.

IV
The appellant further contends that the state violated the discovery requirements of Rule 16, Ala.R.Crim.P., and Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by not disclosing certain statements made by Sheila Irby and James White.
"To prove a Brady violation, a defendant must show (1) that the prosecution suppressed evidence, (2) that the evidence was exculpatory, and (3) that the evidence was material." Hall v. State, 625 So.2d 1162, 1164 (Ala.Cr.App.1993). In the Brady context, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).
Wilson first contends that the state failed to notify her that Sheila Irby would testify that Jimmy Fry had told her that James White said he had been on Boulder Circle. However, the record does not support this argument. This issue was not brought out at trial until Irby's cross-examination when appellant Wilson's counsel attempted to impeach Irby with the transcript of a taped telephone conversation between Irby and Charlie Hooper. Irby made a statement to this effect during the taped conversation. Therefore, Wilson cannot now argue a Brady violation because Wilson was on notice well in advance of trial that Irby might testify to that fact.
The appellant also contends that the state failed to notify her that James White would change his testimony at trial regarding the date when appellant Wilson and Peggy Lowe gave him the .38 caliber pistol. Wilson contends that White stated before trial that he obtained the gun on May 19, 1992. White testified at trial that he received the gun on May 20, 1992. However, the appellant did not preserve this issue for appellate review. A motion to exclude responses of certain witnesses made at the conclusion of their testimony does not preserve error for our review. Jefferson v. State, 449 So.2d 1280, 1282 (Ala.Cr.App. 1982). An objection or a motion to strike should be made when the question is asked. Jefferson, 449 So.2d at 1282.
Even if this issue had been preserved, Wilson has not shown that this evidence was material. There is no reasonable probability that the result of the trial would have been different if Wilson had known of this discrepancy in the dates. James White had already confessed to the murder of Dr. Wilson. There was no evidence presented that White even used the pistol in the murder. This evidence was not exculpatory or material. Rather, it would have only impeached White on a minor factual point. Furthermore, the appellant has not shown that the state actually failed to disclose such information.
The trial court correctly held that no Brady violation occurred.

V
Wilson next contends that the court erred in refusing to exclude the testimony of her accomplice, James Dennison White. Wilson argues that the plea agreement the state entered into with White was "contrary to the public policy of this state" and that it encouraged White to commit perjury. Although Wilson extensively cross-examined White concerning the plea agreement, Wilson did not move to have White's testimony excluded on these grounds until she made a motion for a judgment of acquittal at the close of the state's case. This motion was made long after White had concluded his testimony. Thirty-nine witnesses testified for the state after White completed his testimony and before *462 Wilson made her motion to have his testimony excluded.
A timely objection to testimony at trial is necessary to preserve a matter for appellate review. "[A] motion for mistrial made at the conclusion of a witness's testimony did not preserve the issue of admitting the witness's answer which came in without contemporaneous objection or motion to strike." Robinson v. State, 584 So.2d 533, 538 (Ala.Cr.App.), cert. quashed, 584 So.2d 542 (Ala.1991), citing, Farley v. State, 437 So.2d 639, 640 (Ala. Cr.App.1983). See also Menefee v. State, 592 So.2d 642 (Ala.Cr.App.1991).
The Alabama Supreme Court addressed a similar argument in a civil context in General Motors Corp. v. Johnston, 592 So.2d 1054 (Ala.1992). In that case, General Motors sought to have the testimony of one of the plaintiff's experts excluded after the expert had testified. The court, holding that General Motors had not preserved the issue for appellate review, stated:
"[General Motors] made no objection to Limpert's qualifications as an expert prior to his testimony. While making a motion for a directed verdict at the close of the plaintiffs' evidence, [General Motors] moved to strike Limpert's testimony based on a lack of expertise. At that point, Limpert had already been dismissed as a witness in the case.
"Clearly, [General Motors] should have objected to Limpert's qualifications as an expert before the close of the plaintiffs' evidence. [General Motors] should have objected prior to Limpert's testifying as to his expert opinion. By failing to do so, [General Motors] failed to preserve this issue for review."
General Motors, 592 So.2d at 1057-58.
Wilson did not preserve her argument that White's testimony should have been excluded. Her contention that White's plea agreement rendered his testimony not credible was not timely presented to the trial court.
Furthermore, the credibility of a witness's testimony is a matter for the jury's determination, and a defendant has the right to impeach that witness's credibility by cross-examining the witness about any agreement with the state that could affect his testimony.
"[I]t is well settled that `a defendant has a right to cross-examine an accomplice as to the nature of any agreement he has with the government or any expectation or hope that he may have that he will be treated leniently in exchange for his cooperation. Davis v. Alaska, 415 U.S. 308, 315-16, 94 S.Ct. 1105, 1109-10, 39 L.Ed.2d 347 (1974).' United States v. Barrett, 766 F.2d 609, 614 (1st Cir.) (emphasis added [in Starks]), cert. denied, 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985). If the accomplice has entered into a plea bargain agreement with the State, `the full terms of this agreement must be allowed to be placed before the jury.' Dawkins v. State, 494 So.2d 940, 943 (Ala.Cr.App.1986) (emphasis added [in Starks]). The accomplice's agreement with the State has bearing on his credibility and bias. Id. Additionally, the terms of the agreement provide the jury with an `understand[ing] of the possible motivations of the accomplice as he sits on the stand.' State v. Donelson, 302 N.W.2d 125, 131 (Iowa 1981), quoted with approval in Dawkins v. State, 494 So.2d at 943. Moreover, where, as in this case, the accomplice is a key witness, the trial court has little, if any, discretion to curtail an accused's attempts to show bias or motive on the part of the witness. See Jones v. State, 531 So.2d 1251, 1254 (Ala.Cr.App. 1988); Proctor v. State, 331 So.2d 828, 830 (Ala.Cr.App.1976)."
Starks v. State, 594 So.2d 187, 197 (Ala.Cr. App.1991).
The terms of White's plea agreement were before the jury. Wilson was allowed to extensively cross-examine White about the agreement. Wilson made the jury fully aware of the possible influences that the plea agreement could have had on White's testimony. The jury was free to reject White's testimony. It chose not to do so. The court did not err in refusing to make its own determination of the credibility of White's testimony.

VI
Wilson further contends that Brenda Cerha's testimony should have been excluded *463 because it concerned a statement that the appellant had made six years before the murder. Specifically, she contends that this statement was too remote to be relevant to any issue at trial and that it was also highly prejudicial. Brenda Cerha testified that six years before the murder, appellant Wilson had asked for her help in finding someone to kill her husband.
"The State may prove specific former acts of hostility by the accused against the victim for the purpose of showing malice and motive. Thigpen v. State, 50 Ala.App. 176, 277 So.2d 922 (1973). The acts and declarations of an accused, before or after the offense, are admissible against him for this purpose. White v. State, 380 So.2d 348 (Ala.Cr.App.1980); Thigpen, supra.
"The remoteness in time, alone, of a statement by the appellant which evidences hostility toward the deceased is a matter affecting the weight or probative value of the statement, and not its admissibility. Flurry v. State, 52 Ala.App. 64, 289 So.2d 632 (1973), cert. denied, 292 Ala. 720, 289 So.2d 644 (1974); White supra."
Partridge v. State, 431 So.2d 1377, 1380 (Ala. Cr.App.1983). (Emphasis added.)
"The State may prove former acts of hostility by the accused toward his homicide victim for the purpose of showing motive and intent. Dickerson v. State, 360 So.2d 1053 (Ala.1978). A number of Alabama cases have specifically involved former difficulties between a husband and wife. Shiflett v. State, 262 Ala. 337, 78 So.2d 805 (1955); Blue v. State, 246 Ala. 73, 19 So.2d 11 (1944); Padgett v. State, 49 Ala.App. 130, 269 So.2d 147, cert. denied, 289 Ala. 749, 269 So.2d 154 (1972); Mahaley v. State, 36 Ala.App. 89, 53 So.2d 594, cert. denied, 256 Ala. 77, 53 So.2d 595 (1951)."
White v. State, 380 So.2d 348, 349-50 (Ala.Cr. App.1980). See also Mayfield v. State, 588 So.2d 215, 217-18 (Ala.Cr.App.1991). "Remoteness with respect to the admissibility of evidence is a relative idea and varies in its application according to the facts of each case. Dorch v. State, 40 Ala.App. 475, 115 So.2d 287 (1959)." Palmer v. State, 401 So.2d 266, 269 (Ala.Cr.App.), cert. denied, 401 So.2d 270 (Ala.1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982).
Wilson was charged with hiring someone to kill her husband, an offense that takes preparation. Wilson's statement to Cerha was correctly received into evidence to show Wilson's intent and desire to kill her husband by hiring someone to do the job. The court did not err in allowing Cerha's testimony into evidence.
Furthermore, Cerha's testimony was correctly allowed for the reasons stated in McElroy's Alabama Evidence:
"In a charge of homicide or assault, a threat by the accused to kill or injure the victim is admissible as tending to show a design in the accused to commit the crime and, hence, as tending to show his commission of the crime. Some courts have held such threats admissible as tending to show malice or intent on the part of the accused. The remoteness of the threat by the accused would appear to have no effect upon its admissibility. The threat is admitted no matter how much time has elapsed between it and the homicide or assault."
C. Gamble, McElroy's Alabama Evidence, § 44.02(1) (4th ed. 1990).

VII
Wilson next questions the jury's finding her guilty of hiring someone to murder her husband. Specifically, Wilson cites disparities in the testimony and what she calls the lack of "traditional" evidence. Further, Wilson contends that the jury erred in finding her guilty because, she says, her theory of the case was plausible.
Wilson's issues all deal with the credibility of the evidence, which this court has repeatedly said is within the exclusive province of the jury. Brooks v. State, 630 So.2d 160 (Ala.Cr.App.1993); Coats v. State, 615 So.2d 1260 (Ala.Cr.App.1992); Davis v. State, 593 So.2d 145 (Ala.Cr.App.1991); Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983).
The evidence summarized above established a prima facie case of the capital offense of murder for hire. The case was correctly presented to the jury for its determination. *464 This court is not a second finder of fact.
"Any inconsistencies and conflicts in the evidence were for the jury to resolve. This court is not a finder of fact and will not second-guess juries in their conclusions as to the facts of a case. `"Verdicts rendered [on conflicting evidence] are conclusive on appeal." Johnson v. State, 555 So.2d 818, 820 (Ala.Cr.App.1989).' Dailey v. State, 604 So.2d 436 (Ala.Cr.App.1992). See also Woods v. State, 592 So.2d 631 (Ala.Cr.App.), writ quashed, 592 So.2d 636 (Ala.1991)."
O'Barr v. State, 639 So.2d 533, 536 (Ala.Cr. App.1993).

VIII
The remaining issues concern Wilson's petition for post-conviction relief filed pursuant to Rule 32, Ala.R.Crim.P. In her petition, Wilson asserted two grounds upon which she contended she was entitled to a new trial. The circuit court held a hearing on Wilson's claims that James White had recanted his trial testimony and that the prosecution had withheld evidence. After the hearing, the court issued an order denying Wilson's petition.

A
Wilson first contends that the court erred in refusing to grant her a new trial based upon her contention that James White had recanted his testimony. In support of her contention, Wilson presented testimony from Mike McCulley, an inmate housed next to White at the Madison County jail, and a notarized affidavit allegedly signed by White.
McCulley testified that White told him that Betty Wilson had had nothing to do with the murder and that White had acted alone. He also testified that he overheard White praying for forgiveness for lying about Betty Wilson.
The notarized affidavit allegedly signed by White stated that neither White nor Betty Wilson were involved in the murder of Dr. Wilson and that White had fabricated the entire story about both his and Betty Wilson's involvement in the murder to appease the police.
The court made the following findings of fact concerning Wilson's claim on this issue:
"In support of the proposition concerning newly discovered material facts, the Petitioner offered, and the Court admitted, over the State's objection, an affidavit purportedly made by James Dennison White. The Court also considered testimony from Mike McCulley who was an inmate incarcerated with White at the Madison County Jail prior to Petitioner's trial. This witness testified that White made statements while in jail which were inconsistent with his testimony at trial.
"At the Rule 32 Hearing, White was called as a witness by the Petitioner and as to matters relevant to recantation, refused to testify, claiming his Fifth Amendment privilege against self-incrimination. He neither admitted the contents of the affidavit nor explained any involvement with its production. The Court, to resolve this issue, must determine whether White's testimony at trial was truthful or whether, assuming arguendo there is evidence of recantation, that the recantation is truthful. The burden is on the defendant to reasonably satisfy the Court that, assuming recantation, that it is the truth and that it would have changed the outcome of the trial.
"Doubt exists concerning the circumstances surrounding the production of White's affidavit, and considering White's refusal to testify at the Rule 32 Hearing, whether or not the Petitioner has met the burden of proof to establish recantation. Assuming, but not finding, that there was a recantation, the court must then determine which testimony is truthful. In making this determination, the Court considers all of the testimony given at this Hearing and all of the testimony given at the trial of the Petitioner. There was considerable evidence at the trial given by objective, good citizens, which supported the details of White's testimony. The testimony supporting recantation for the most part is from a convicted felon and an affidavit apparently from White which the Court has considered out of an abundance of *465 caution that the Petitioner be treated fairly.
"The Court received evidence that White has been sentenced to life in prison after the Petitioner's trial and that any recantation has been only after receiving the benefit of his plea bargain with the State to testify against Petitioner. As cited in Peoples v. State, 565 So.2d 1177 (Ala.Cr.App. 1990), the Court finds that recanting testimony is inherently unreliable and untrustworthy.
"Based upon the testimony of witnesses other than White at trial, as cited by the State, and the inferences drawn by this Court from those witnesses and others, the Court finds that the testimony of James Dennison White at trial was credible.
"The Court further finds evidence presented as to a recantation by White, since trial, does not reasonably satisfy the Court as to the truthfulness of any recantation, and, to the contrary, the Court finds that allegations contained in White's apparent affidavit [are] not credible and [are] false.
"The Court further finds that the Petitioner has failed to meet the burden of proof necessary to establish any relief based upon a recantation by witness White."
The standard governing the issue of recanted testimony was set out by the Alabama Supreme Court in Ex parte Frazier, 562 So.2d 560, 569-70 (Ala.1989):
"In order to grant a motion for new trial alleging perjured testimony, the trial court must be reasonably well satisfied 1) that testimony given by a witness at trial was false; 2) that there is a significant chance that had the jury heard the truth, it would have reached a different result; 3) that the evidence tending to prove the witness's perjury has been discovered since the trial; and 4) that that evidence could not have been discovered before or during trial by the exercise of reasonable diligence."
The court, in its order, found that appellant Wilson had not met her burden of proof as to the first element of this standard.
"`"[R]ecantation by witnesses called on behalf of the prosecution does not necessarily entitle defendant to a new trial. The question of whether a new trial shall be granted on this ground depends on all of the circumstances of the case, including the testimony of the witnesses submitted on the motion for the new trial. Moreover, recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true."'
"`Further, "the courts, with their experience with witnesses, generally pay but little regard to the statements of recanting witnesses, and only in extraordinary cases will a new trial be allowed because of recanting statements."'
"Robinett v. State, 494 So.2d 952, 955 (Ala. Cr.App.1986) (citations omitted).
"`"... [W]here a witness who has testified at a trial makes an affidavit that such testimony is false, little credence ordinarily can be placed in the affidavit.'" King v. State, 574 So.2d 921, 925 (Ala.Cr.App.1990) (quoting People v. McGaughran, 197 Cal. App.2d 6, 17, 17 Cal.Rptr. 121, 128 (1961)).
"`The granting or denial of a new trial on the ground of newly discovered evidence is a matter left largely to the discretion of the trial judge, whose decision will be overturned only for an abuse of that discretion. White v. State, 294 Ala. 265, 314 So.2d 857 [, cert. denied, 423 U.S. 951[, 96 S.Ct. 373, 46 L.Ed.2d 288]] (1975). An appellate court, in reviewing a grant or denial of a new trial motion, is obliged to indulge every presumption in favor of the correctness of the trial court's decision. Ward v. State, 440 So.2d 1227 (Ala.Cr.App.1983); Woodard v. State, 401 So.2d 300 (Ala.Cr. App.1981).'
"Ex parte Robinson, 565 So.2d 664, 667 (Ala.1990).
"`The granting of a new trial on the ground of newly discovered evidence rests in the discretion of the trial court and depends largely on the credibility of the new evidence. Snider v. State, 473 So.2d 579 (Ala.Cr.App.1985); Robinson v. State, 389 So.2d 144 (Ala.Cr.App.), cert. denied, 389 So.2d 151 (Ala.1980). *466 The trial court is the factfinder in a hearing on a motion for a new trial, and a condition to the granting of a new trial on the basis of newly discovered evidence is that the trial court must believe the evidence presented. McDonald v. State, 451 So.2d 440 (Ala.Cr.App.1984).'
"McMillian v. State, 594 So.2d 1253, 1264 (Ala.Cr.App.1991), remanded as to result, 594 So.2d 1288 (Ala.1992). `This Court can neither pass judgment on the possible truthfulness or falsity of testimony, ... nor on the credibility of witnesses.' Collins v. State, 412 So.2d 845, 846 (Ala.Cr. App.1982). `[A] presumption of correctness will continue to be indulged in favor of the trial court's factual findings, and the trial court's ruling on the motion will be upheld on appeal unless it is clearly erroneous.' Frazier, 562 So.2d at 570."
Cavender v. State, 629 So.2d 721, 722-23 (Ala.Cr.App.1993). See also Howard v. State, 611 So.2d 1143 (Ala.Cr.App.1992); Wadsworth v. State, 507 So.2d 572 (Ala.Cr. App.1987); Peterson v. State, 426 So.2d 494 (Ala.Cr.App.1982); Pitts v. State, 360 So.2d 736 (Ala.Cr.App.1978); Wallace v. State, 41 Ala.App. 65, 124 So.2d 110, cert. denied, 271 Ala. 701, 124 So.2d 115 (1960).
Based upon a review of the record, we hold that the court did not err in refusing to grant Wilson a new trial based on the alleged recantation of James Dennison White's trial testimony.

B
Wilson also contends that the state should have provided her with a copy of the notes of Dr. Lawrence Maier, a psychologist who evaluated James White. Wilson made the following written stipulations as to the facts relevant to her argument on this issue:
"1. Dr. Lawrence R. Maier was appointed to do a mental competency evaluation of James Dennison White. Dr. Maier is regularly employed on a contract basis by the Alabama Department of Mental Health and Mental Retardation to evaluate all criminal defendants where there is a question as to their mental competency. Dr. Maier is employed to work in the Huntsville, Alabama, area. Maier's evaluation of White was the result of action taken by White's attorney, Roy Miller. The request by Miller for the evaluation was made in the case of State of Alabama v. James Dennison White, CC-92-1193-FJ. The evaluation was ordered by Judge Jeri Blankenship on July 14, 1992.
"2. On August 5, 1992, Dr. Maier interviewed James Dennison White. Thereafter, Dr. Maier filed a formal report with the District Attorney of Madison County, Alabama, with Judge Blankenship, and with Roy Miller.
"3. Prior to the trial of Betty Woods Wilson for capital murder, the report prepared by Dr. Maier was supplied to Betty Woods Wilson's lawyers, namely, Marc Sandlin, by Assistant District Attorney, Susan T. Moquin, pursuant to an order by Judge Thomas Younger.
"4. It is the practice of Dr. Maier to cause his notes to be transcribed and typed. Dr. Maier's notes, taken during the interview of James Dennison White, were typed up into a three page document entitled `Additional Information Section.' These transcribed notes were sent by Dr. Maier to Taylor Hadin Secure Medical Facility as required by him of the Department of Mental Health and Mental Retardation. However, the notes were not supplied to the District Attorney of Madison County, Alabama, to the Assistant District Attorney involved, to Judge Blankenship, to Roy Miller, or to special prosecutor, James Fry. The notes ... were not supplied to Betty Wilson's lawyers prior to her trial."
The parties further orally stipulated to the fact that "at no time did any member of the prosecution or the police or anyone related to the prosecution, ever become aware of the existence of [the] notes until it was brought to [the prosecution's] attention by [defense counsel] in this Rule 32 proceeding."
At the hearing, Wilson presented testimony from Charles Hooper, one of her attorneys. He testified that Dr. Maier's notes revealed a statement made by White as to the time that he was at the Wilson residence that was inconsistent with his trial testimony. *467 He testified that, before Wilson's trial, he met with Dr. Maier to discuss Dr. Maier's evaluation of James White, but that he did not discover this discrepancy in White's rendition of the facts surrounding the murder at that time.
The court made the following findings in regard to Wilson's contention that the prosecution withheld Dr. Maier's notes from her:
"The parties entered a stipulation in regard to Dr. Maier's `additional' notes. In addition, this written stipulation was supplemented by agreement at the Rule 32 Hearing to make clear that at no time was any member of the prosecution of this case aware of the existence of the report complained of until after Petitioner's trial.
"Based upon all of the evidence and the stipulation entered by the parties, the Court finds that even had the apparent inconsistency been used in White's cross-examination, there is no significant chance that the jury would have reached a different result. There were some inconsistencies in White's testimony at trial, but there were also many other factors considered by the jury. The record is replete with testimony from credible witnesses linking the Petitioner to Mr. White and the crime. The fact that Dr. Maier's `additional notes' may have been useful to the defense is not the legal question. The Court finds specifically that this additional evidence would not have changed the outcome of the trial.
"Further, there is no evidence before the Court that Dr. Maier was ever an agent of the prosecution or that information known by him could be imputed to the prosecution. The Court finds that Dr. Lawrence Maier was not an agent or employee of the prosecution. The report and `additional information' (interview notes) which he generated were done by order of Judge Jeri Blankenship at the request of White's defense counsel in State v. White. The evaluation of White was filed in his case and copies provided his attorney and the prosecution in White's case. Later, upon motion of Petitioner's attorneys, the evaluation was provided to the Petitioner by the State. It is uncontested that neither the prosecutors in State v. White nor the Special Prosecutor in Petitioner's case were aware of the existence of the `additional notes' prior to trial. The prosecution did not violate any right of the Petitioner to receive exculpatory evidence. The Court finds specifically that the State had no control over nor knowledge either actual or imputed of the complained evidence.
"Finally, as to the issue concerning `additional notes,' it is clear that the evidence is not newly discovered. By stipulation and the testimony of Petitioner's attorney, Mr. Charles Hooper, it is clear that White's evaluation report was important to the defense. They requested and received a copy of the evaluation containing references to the dates and times White was interviewed by Dr. Maier. They were on notice that Dr. Maier had interviewed White in compiling his evaluation and should have anticipated that he took notes during the interview. Charles Hooper testified that he spoke with Dr. Maier prior to trial. Had the notes been requested they could have been produced by Dr. Maier either voluntarily or by court order."
In Parker v. State, 587 So.2d 1072, 1086 (Ala.Cr.App.1991), this court stated:
"The appellant's discovery rights under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), were not violated because the prosecutor is not required to disclose evidence he does not possess. While it is true that under Brady the good faith of the prosecutor in not disclosing information is irrelevant, 373 U.S. at 87, 83 S.Ct. at 1196, Brady does require that the information requested be known to the prosecution. United States v. Agurs, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); Antone v. Strickland, 706 F.2d 1534, 1544 (11th Cir. 1983) (Kravitch, J., concurring specially) [, cert. denied, 464 U.S. 1003, 104 S.Ct. 511, 78 L.Ed.2d 699 (1983)].... United States v. Walker, 720 F.2d 1527, 1535 (11th Cir. 1983), cert. denied, 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984)."
See also Hill v. State, 651 So.2d 1128 (Ala.Cr. App.1994).
*468 Based upon the reasons stated in the court's order, the prosecution did not withhold evidence from Wilson.

C
Wilson further contends that the trial court erred by allowing James White to invoke his Fifth Amendment privilege against self-incrimination at the post-conviction petition hearing.
Wilson's counsel attempted to question White about an affidavit he wrote in which he recanted part of his testimony against Wilson. The trial court allowed White to invoke his Fifth Amendment privilege because if he had been compelled to testify he would have been forced to admit under oath that he committed perjury at the appellant's trial.
Initially, we observe that the Fifth Amendment to the United States Constitution states in part that "No person ... shall be compelled in any criminal case to be a witness against himself...." See Art. I, § 6, Alabama Constitution of 1901.
The situation in the present case is analogous to that in Pennington v. State, 420 So.2d 845 (Ala.Cr.App.1982). In Pennington, the defendant called a witness, at a hearing on a motion for a new trial, who had testified at trial. The witness had previously indicated to the defendant's attorney that he might recant his trial testimony. The trial court made it clear that the witness would be prosecuted for perjury if he testified differently at the motion hearing than he had at trial. Thereafter, the witness invoked his Fifth Amendment privilege against self-incrimination. On appeal, the defendant argued that the witness waived the right to invoke his Fifth Amendment privilege at the motion hearing by testifying at the hearing.
Regarding the Fifth Amendment, this court stated:
"Individuals who testify in either civil or criminal proceedings have the right to refuse to answer relevant questions where the answers might tend to incriminate them in future proceedings. Lefkowitz v. Turley, 414 U.S. 70, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973); McCarthy v. Arndstein, 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158 (1924); Vail v. Vail, 360 So.2d 985 (Ala.Civ.App.1977), rev'd, 360 So.2d 992 (Ala.1978).
"The Fifth Amendment insures that a person can not be compelled, when acting as a witness, a party to a civil action, or a defendant in a criminal proceeding, to give testimony which might tend to show that he himself committed a crime. Consequently, in any of these contexts, a witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant. Without such protection, if the witness is nevertheless compelled to answer, said answers are inadmissible against him in a later criminal prosecution. Lefkowitz, 414 U.S. at 77-78, 94 S.Ct. at 322-23."
Pennington, 420 So.2d at 849.
The trial court correctly allowed James White to invoke his Fifth Amendment privilege against self-incrimination at the Rule 32 petition hearing.
For the foregoing reasons, appellant Wilson's conviction for capital murder and her sentence to life in the penitentiary without parole are affirmed. The court's denial of the petition for post-conviction relief is also affirmed.
AFFIRMED.
All the Judges concur except PATTERSON, J., who dissents with opinion.
PATTERSON, Judge, dissenting.
I dissent from the majority opinion in this case. It is my opinion that the state failed to corroborate the testimony of the accomplice, James Dennison White, as required by Code of Alabama 1975, § 12-21-222.
The state concedes that White was an accomplice in the commission of the crime charged in the indictment, and the trial court correctly found that White was an accomplice as a matter of law. The state also concedes *469 that if the conviction in this case is to stand, it must rest upon the testimony of White.[3]
Section 12-21-222 provides as follows:
"A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
The purpose of this statute is obvious.
"Our legislature recognized ... that a guilty party, when offered immunity from prosecution, will point an accusing finger in any direction to avoid prosecution. The more serious the penalty, the more likely a false accusation will occur. Thus, our legislature, in order to protect the innocent and to preserve the presumption of innocence, has required additional evidence for a conviction in such cases via § 12-21-222."
Reed v. State, 407 So.2d 153, 158 (Ala.Cr. App.1980) rev'd on other grounds, 407 So.2d 162 (Ala.1981).
The test in this state for determining whether there was sufficient corroboration of the testimony of an accomplice consists of eliminating the testimony given by the accomplice and examining the remaining evidence to determine if there is sufficient incriminating evidence tending to connect the defendant with the commission of the offense. Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973); Andrews v. State, 370 So.2d 320 (Ala.Cr.App.), cert. denied, 370 So.2d 323 (Ala.1979). Corroborative evidence need not be strong, nor sufficient in and of itself to support a conviction; it need not directly connect the accused with the crime, but only tend to do so. Andrews v. State. The rule is well stated by the Alabama Supreme Court in Sorrell v. State, 249 Ala. 292, 293, 31 So.2d 82, 83 (1947), as follows:
"The corroboration necessary to support the testimony of an accomplice must be of some fact tending to prove the guilt of the accused. It is not sufficient if it is equivocal or uncertain in character and must be such that legitimately tends to connect the defendant with the crime. It must be of substantive character, must be inconsistent with the innocence of the accused and must do more than raise a suspicion of guilt."
The appellant, Betty Woods Wilson, preserved this issue for review by a timely motion for a judgment of acquittal made at the conclusion of the state's case-in-chief. In reviewing the correctness of a trial court's denial of a motion for a judgment of acquittal, a reviewing court may consider only that evidence before the trial court at the time the motion was made, and must consider that evidence in the light most favorable to the state's case. Mills v. State, 408 So.2d 187 (Ala.Cr.App.1981); Kent v. State, 367 So.2d 508 (Ala.Cr.App.1978), cert. denied, 367 So.2d 518 (Ala.1979).
I will undertake a more detailed discussion of the state's evidence than that contained in the majority opinion because I believe that it is necessary to an understanding of this issue. White testified for the state that while doing odd jobs and carpentry work for the teachers at Vincent Elementary School in Vincent, Alabama, he became friends with Peggy Lowe, a first-grade teacher and the appellant's twin sister. He further testified *470 that he began to have telephone conversations with her around September or October 1991; that he occasionally did carpentry work at her home from October 1991 through April 1992; that she confided in him about her marital problems; and that she told him that she loved him and that she was interested in having "something happen" to her husband. He further testified that he told her that he could arrange for something to happen to her husband.
White also stated that shortly after the first of the year in 1992, Lowe told him about a "friend" who wanted something to happen to the "friend's" husband; that around the end of March or the beginning of April 1992, she identified this "friend" as Betty Wilson and he and Lowe agreed that he would arrange the death of Dr. Wilson, for $5,000, with half of the money to be paid up front; and that around the middle of April Lowe gave him $2,500 in cash. He further testified that he deposited $500 into his checking account to cover overdrafts, that he paid checks that had "bounced," and that he paid a number of utility bills that were in arrears. He testified that he had sexual intercourse with Lowe only one time, which was on May 15, 1992; that either that night or the following night he told Lowe that he would need some expense money to go to Huntsville to kill Dr. Wilson; and that she told him to drive to Lake Guntersville State Park where her sister was attending an Alcoholics Anonymous (hereinafter "AA") meeting and he would find $200 in a library book in the back seat of her sister's black BMW automobile, which would be parked near the entrance and which would be unlocked.
White testified that he went to the park, arriving around 10:00 p.m.; that the security guards would not let him on the grounds so he went to a nearby telephone booth and telephoned Lowe for instructions; that she told him to keep calling her sister's room; that he called the front desk in an effort to locate Wilson; that the security guard brought him a book titled The Sleeping Beauty and The Firebird, a book about a ballet; and that in the pocket for the library checkout card were two $100 bills.
White testified that after he left the park, he purchased two packs of cigarettes, a case of beer, and a bottle of caffeine tablets known as "fast ones"; that he took 15 "fast ones" and started drinking beer; and that he drove to Huntsville where, using directions he had been given by Lowe, he drove to Wilson's house. He stated that Lowe had told him that if there was a blue truck in the driveway of the house, he should not stop because that meant that the Wilsons' son, was at home; that as he drove by he saw a blue truck parked at the house; and that he did not stop but returned to his home in Vincent.
White stated that two or three days later, Wilson called him at his home and asked him "what the fuck was going on," and that Lowe also called him and told him that Dr. Wilson had to be killed before May 24, the day he and Wilson were to leave on a trip to Santa Fe, New Mexico, because Wilson did not want to spend the night in the same hotel room with her husband and that, if the job was not done, he would have to return the $2,500 she had previously given her; and that, in response, he told Lowe that he did not have a weapon. White further testified that Lowe telephoned him on May 20, 1992, and told him to meet her at Logan Martin Dam around 5:00 p.m. or 5:30 p.m. that evening. He testified that he went to Logan Martin Dam, where Lowe got out of a black BMW automobile and came over to his truck, opened the passenger side door, and dropped a gun out of a white sweater onto the seat. He explained that he wrapped the gun in a piece of brown towel, drove home, and hid it in a hole on his back porch.
White testified that he spoke with the appellant on the telephone shortly after he received the gun and she told him that he should do the job at Dr. Wilson's office; that he went to Huntsville in the early morning of May 21, 1992, and waited in the parking lot of Dr. Wilson's office; that he had a rope with him because he had decided that he did not want to use the gun because he was "gun shy" as a result of the time he had spent in Vietnam; that he never saw Dr. Wilson arrive at his office; that there were too many people around the office area; and that he *471 decided not to kill Dr. Wilson at his office. He further testified that he called Lowe from a pay telephone around 8:00 or 8:30 that morning; that he talked with Wilson, who was at Lowe's house; that he told her he did not have enough money to stay in Huntsville; and that she told him that she would meet him at the a fast food restaurant at the Parkway City Mall in Huntsville around noon or 1:00 p.m. that afternoon and that she would bring him some money. He testified that he met Wilson at the restaurant where she gave him a $100 bill.
White testified that around 2:30 that afternoon, he checked into a motel and paid cash for his room; that he telephoned his brother, Wilson, and Lowe from his room; and that during his call to Lowe she told him that she cared for him. He stated that he decided to view the Wilson home so he drove by it several times in his truck, and then parked his truck, and jogged through the neighborhood to get a better look at the house; that while he was jogging in the neighborhood, Wilson drove up in her son's truck and gave him a glass of water; and that he thereafter returned to the motel where he spent the night. He stated that the following morning, he received a telephone call from Wilson, who told him that Dr. Wilson was at his office; that he told her that he had decided to kill Dr. Wilson at his house because the area around Dr. Wilson's office was so populated; that he further told her that she needed to take him in her vehicle to her house because his truck was easily recognizable and having her drive him to her house would draw less attention; and that she told him that she would pick him up at around 3:00 p.m. in the parking lot of the Parkway City Mall.
White testified that thereafter he drove to the Parkway City Mall were he met Wilson about 2:30 p.m.; that, as Wilson got out of her automobile, he observed her "squat down" and tie the laces of her flowered tennis shoes; and that he got in Wilson's black BMW automobile and hid on the floor while she drove him to the Wilsons' home. White further stated that, after they arrived at the Wilson home and Wilson drove the automobile into the garage, she handed him $40 and told him where her husband's bedroom was located and that when she called the house later, he was to pick up the telephone and hang it up as a signal that the job had been completed. He testified that he entered the house; that he started rummaging through furniture drawers looking for money and other valuables because he wanted to create the appearance that a robbery had occurred; that he took nothing from the house; that he took a rope into the house with him but does not remember taking a knife; and that he became very nervous waiting for Dr. Wilson to come home. He stated that when Dr. Wilson came home two or three hours later, they met each other at the top of the stairs just outside of Dr. Wilson's bedroom; that Dr. Wilson grabbed him; that he grabbed "some" object and began hitting Dr. Wilson over and over; that he does not remember what object he used to hit Dr. Wilson; that he then "blacked out" and does not remember stabbing Dr. Wilson; and that the next thing he remembers is being in the woods behind the Wilsons' home.[4] He testified that although Wilson had told him that he should leave through the woods behind her house, he walked back to the house and saw Wilson driving into the driveway; that he got into Wilson's automobile and she drove him to his truck, which was parked at the mall; that while he was lying in the back seat of the automobile he covered himself with some clothing and plastic bags, including a pink bag; and that he observed a "bank bag." He stated that, after Wilson let him out at his truck, he purchased some items, including beer, and then drove home.
White testified that he was to pick up the balance of his contract money from a bag that Lowe was to leave in her garage; that on the Sunday after the murder, he drove to Lowe's home to get the money; that the money was not in the garage; and that when a neighbor observed him, he asked the neighbor to tell the Lowes that he had come by to *472 pick up his ladder and some painting supplies that he had left in their garage.
The state presented the testimony of numerous witnesses in an effort to corroborate the testimony of White. The testimonies of these allegedly corroborating witnesses will be discussed in some detail as they relate to the particular areas of corroboration alleged by the state.
The state correctly points out in brief that corroboration need only be slight to suffice; that circumstantial evidence is sufficient to corroborate if it proves that the accused was connected with the criminal act, or tends to connect the accused with the criminal act, or if such connection may reasonably be inferred from the evidence; and that the question is not whether any single piece of evidence apart from the testimony of the accomplice is sufficiently corroborative when considered in isolation, but whether all of the other evidence when considered in combination is sufficiently corroborative. See Miller v. State, 290 Ala. 248, 275 So.2d 675 (1973); Hodges v. State, 500 So.2d 1273 (Ala. Cr.App.1986); Blevins v. State, 56 Ala.App. 115, 319 So.2d 734 (1975). The state urges this court to consider the cumulative effect of the independent evidence which, for the most part, falls within the following four categories: (A) motive, (B) threats, (C) suspicious conduct, and (D) indications of consciousness of guilt. For the purposes of my discussion, I believe it is necessary to discuss the individual aspects of these categories. Although I treat these categories severally and do not specifically address each minute fact urged by the state to be corroborative, I have considered the cumulative effect of all of the independent evidence.

A. Motive
The state offered the following evidence, which it contends shows the existence of motive on the part of the appellant to commit the crime for which she was convicted:
(1) Joey Luttrell, an assistant trust officer with South Trust Bank in Huntsville, testified as to the value of Dr. Wilson's estate. She valued his personal estate at $2,541,022, and the joint estate of him and his wife at $3,815,208.70, with the total value of all assets at over $6,300,000.
(2) Dr. Wilson's will left the bulk of his individual estate to Betty Wilson.
(3) Jo Anne Chiri, an ophthalmological technician for Dr. Wilson for 15 years, was acquainted with Betty Wilson because Wilson occasionally worked in her husband's office. Chiri testified that Wilson spoke "unkindly" about Dr. Wilson and that, on several occasions, Wilson told her that she would like to be a well-respected widow and that she did not want a divorce. She testified that Wilson's relationship with her husband, Dr. Wilson, deteriorated. These conversations between Chiri and Wilson apparently occurred several years before the murder.
(4) Brenda McDowell, Dr. Wilson's bookkeeper and insurance clerk for the two years before his death, testified that when Wilson came into the office in a rage one day because Wilson had not met her as he was supposed to, she "shot a bird," said "you can give him this for me," and then walked out of the office. McDowell also testified that Wilson told her that she had completely disassociated herself from her husband and that she did not care for him anymore.
(5) M.A.L., a member of AA with Wilson and a very close friend of Wilson's in 1988 and 1989, testified that Wilson was very critical of her husband, that she often said degrading things about him, and that Wilson told her that she had dreams about Dr. Wilson being dead and that she wished he was dead. She also testified that her friendship with Wilson ended when Wilson began asking her to cover for her when she took trips to New York to see a man with whom she was having an affair.
(6) L.L., Wilson's sponsor in AA, testified that Wilson was having an affair with a man in New York, as recently as one month prior to the murder, and that Wilson told her that she was in love with the man.
(7) E.F., a fellow AA member, testified that he had had a five-year affair with Wilson which ended in May, the same month that Dr. Wilson was murdered.

*473 (8) Shirley Green, one of the Wilsons' housekeepers, testified that Wilson did not like her husband, that she would not let him touch her, and that she married him for his money.
(9) Wilson and her husband occupied separate bedrooms.
In considering this evidence, a reviewing court is limited by the recognized principle that evidence of motive alone is not sufficient corroborative evidence; however, evidence of motive can be used in connection with other evidence that tends to connect the accused with the crime. See Mathis v. State, 414 So.2d 151 (Ala.Cr.App.1982); Jacks v. State, 364 So.2d 397 (Ala.Cr.App.1978) cert denied, 364 So.2d 406 (Ala.1978); 23 C.J.S. Criminal Law § 1017 (1989). Thus, I turn to the other evidence urged by the prosecution to be corroborative.

B. Threats
Corroboration may be shown through evidence of malice, ill will, or threats that the accused has made or demonstrated toward the victim. Jacks v. State. The state argues that, under this principle, the following testimony of Brenda Cerha offers corroborative evidence: Shortly after Cerha's husband committed suicide in 1986, Wilson asked her whether she had killed her husband. After she repeatedly denied that she had killed her husband, Wilson stated that she wanted to kill her husband and she asked Cerha if she would help her or if she knew how to do it. To Cerha's question of why did Wilson did not simply ask for a divorce, Wilson answered that she wanted to be a widow and not a divorcée and that she would "lose everything" in a divorce. This conversation occurred six years before Dr. Wilson's death.
Corroborative evidence should tend directly and immediately, and not remotely, to connect the defendant with the commission of the offense, must be as to a material matter, and must be criminative of the defendant on trial. Cheatwood v. State, 22 Ala.App. 165, 113 So. 482 (1927) cert denied, 113 So. 482, 22 Ala.App. 165 (Ala.1927); People v. Reingold, 87 Cal.App.2d 382, 197 P.2d 175 (1948); Holladay v. State, 709 S.W.2d 194 (Tex.Cr.App. 1986); Ingram v. State, 78 Tex.Crim. 559, 182 S.W. 290 (1915); P. Herrick, Underhill's Criminal Evidence, §§ 184, 185 (5th ed. 1956). In my opinion, the conversation between Cerha and Wilson is too remote to be corroborative; it does not tend to directly and immediately connect Wilson with this crime. Furthermore, the conversation is also too uncertain in character in regard to a crime committed six years after that conversation to be considered evidence corroborative of White's testimony. Moreover, the evidence shows that at the time of the conversation, Wilson was intoxicated, Cerha had had a drug "problem," and Cerha did not take the conversation seriously. The conversation contains no facts that reasonably, legitimately, or fairly connect or tend in some degree to connect the appellant to the crime for which she was convicted, or with its commission.[5]Holladay v. State.

C. Suspicious Conduct
The state contends that the following evidence tends to connect Wilson to this crime due to its suspicious nature:
(1) Wilson's gun was found at White's house.
(2) The library book checked out in Wilson's name was given to White at Lake Guntersville State Park, and the police later found that book in White's possession.
(3) Wilson lied to her roommate at the AA convention about the reason she was called away from the meeting by telling her that she had a telephone call from F.B.
(4) Wilson talked to N.N. several days after Dr. Wilson's death and told her that Lowe was having an affair with a carpenter.
(5) Earl Cagle testified that Wilson and Lowe acted in a strange manner when he awakened them at 6:30 on the morning after Dr. Wilson's funeral and told them *474 that White had been arrested for murdering Dr. Wilson.
(6) Wilson was wearing wrinkled casual clothes on May 22, the day of the murder, and several members of AA testified that this was unusual.
(7) N.N. testified that Wilson, who was helping to sponsor N.N. at AA, told her that she was too busy to go shopping on the afternoon of May 22 and that she would meet her at the AA meeting. N.N. testified that this was a critical time in her AA program and that she thought it was unusual for Wilson not to meet her to go shopping.
(8) Sheila Irby saw Wilson going toward her home at 5:10 p.m. on the day of the murder.
Sufficient corroboration of the testimony of an accomplice to warrant a conviction may be furnished by the suspicious conduct of the accused, such as flight, concealment or attempts to bribe a witness. Glasco v. State, 513 So.2d 54 (Ala.Cr.App.1987), cert denied, 513 So.2d 61 (Ala., 1987); Pierson v. State, 39 Ala.App. 346, 100 So.2d 47 (1957), cert. denied 267 Ala. 696, 100 So.2d 50 (Ala., 1958); Prophett v. State, 25 Ala.App. 20, 141 So. 257 (1932), cert. denied, 224 Ala. 584, 141 So. 258 (Ala., 1932); 23 C.J.S., supra, § 1021 (1989). However, the evidence must do more than raise a suspicion of guilt and must be inconsistent with the innocence of the accused. Mullis v. State, 545 So.2d 205 (Ala.Cr.App. 1989).
I do not consider the fact that Wilson's gun was found at White's house, where White said it would be found, to be corroborative testimony under the facts presented. The fact that Wilson's gun was found at White's house in no way tends to connect her to her husband's murder absent the testimony from White.
I also do not consider the following actions by Wilson and/or evidence to be corroborative: Wilson's comment to N.N. shortly after the funeral that her sister was having an affair with a carpenter; Cagle's opinion that Wilson and Lowe acted strangely when they were awakened and told that White had been arrested; the fact that Wilson was wearing wrinkled casual clothes on the day of the murder; and the appellant's comment to N.N. that she was too busy to meet her to go shopping on May 22 and that she would see her at the AA meeting. These actions and/or evidence in no way tend to connect Wilson to the murder of her husband. Furthermore, they are not substantive and are not inconsistent with Wilson's innocence.
I do recognize the following to be suspicious conduct: Wilson's indirect contact with White, at Lake Guntersville State Park, approximately one week before her husband's murder when, at Wilson's request, a book from her car was delivered to White at the front gate; and Wilson's lie to N.N. that she was called away from the AA meeting at the park to speak to F.B. on the telephone. However, I do not consider these facts to meet the criteria that evidence, to be corroborative, "must be of a substantive character, must be inconsistent with the innocence of the accused and must do more than raise a suspicion of guilt." Sorrell v. State, 249 Ala. at 293, 31 So.2d at 83. See, e.g., Lindhorst v. State, 346 So.2d 11, 17 (Ala.Cr.App. 1977), cert. denied 346 So.2d 18 (Ala.1977), (wherein the court found that evidence that the defendant checked into a motel, under an assumed name with two accomplices on the day of the murder, although suspicious, was not sufficiently corroborative because "the mere raising of a suspicion is not enough"). Moreover, the incriminating nature and significance of the indirect contact was shown only by the testimony of White. Evidence is insufficient to corroborate "if it tends to connect accused with the offense only when given direction or interpreted by, and read in conjunction with, the testimony of the accomplice." 23 C.J.S., supra, § 1015(b) (1989).
In regard to the state's assertion that Irby's testimony of her observation of Wilson driving toward the Wilsons' home at 5:10 p.m. on the day of the murder is corroborative as placing Wilson near the scene of the crime near the time it occurred, I reiterate the following principles:
"In Senn [v. State], 344 So.2d [192,] 193 [(Ala.1977)], the court stated:
"`Being seen in the company of an accomplice in close proximity in time and *475 place to the commission of a crime is not in itself always sufficient corroboration to meet our statutory requirements. Tidwell v. State, 37 Ala.App. 228, 66 So.2d 845 (1953, per Harwood, J.) [cert. denied, 259 Ala. 464, 66 So.2d 848 (1953)]. On the other hand, if the accused and accomplice are seen together in unusual places and in close proximity in time and place to the scene of the crime, which was committed at an unusual hour, the requirements of corroboration may be met. Tidwell, supra.'"
Massey v. State, 497 So.2d 590, 593 (Ala.Cr. App.1986) (emphasis added).
The only direct testimony of the time of the murder of Dr. Wilson was from White. Thus, once again, the significance of a fact urged by the state to be corroborative is dependent upon White's testimony. Moreover, the state presented evidence that, on the afternoon of the murder, Wilson was seen at the Village Shop at 4:55 p.m.; at 5:25 p.m. in the parking lot of the building where the AA meeting was to start at 5:30 p.m.; at the campaign headquarters of the district attorney between 5:30 and 5:45 p.m.; and back at the AA meeting by 6:00 p.m. This chronology presented by the prosecution weakens the prosecution's evidence of Irby's observation of Wilson near her home at 5:10 p.m. There is no evidence, other than the testimony of White, that places Wilson with White on the day of the murder. In fact, no one places Wilson in White's company at any time. Finally, I note the obvious: it was not unusual for Wilson to be driving in the area of her home in the late afternoon.

D. Indications of Consciousness of Guilt
An accused's consciousness of guilt as shown by the evidence may be corroborative. Fuller v. State, 34 Ala.App. 211, 39 So.2d 24 (1948), cert. denied 252 Ala. 20, 39 So.2d 29 (Ala.1949); 23 C.J.S. supra, § 1017 (1989). However, where the particular conduct that is urged as evidence of consciousness of guilt has no relation to the offense charged and can shed no light upon it, the conduct should be rejected by the trial court as not corroborative. Fuller v. State.
The state contends that Wilson, during her May 24 interview with the Huntsville police, exhibited consciousness of guilt by lying several times, as follows:
(1) Wilson stated that she had had affairs in the past, but failed to specifically disclose her recent affairs with E.F. and the man in New York.
(2) She stated that she did not know or care what her husband's will stated and that he changed his will often.
(3) She did not tell the police that she did in fact buy a pair of flowered tennis shoes at Yieldings department store on the day of the murder, as the state proved.
(4) She failed to tell the police that she went to the tanning salon on May 22, as proven by the state.
(5) Wilson stated that she went directly from the pharmacy to the AA meeting, yet the state produced evidence that she left the AA meeting before it started and did not return until 6:00 p.m.
The state contends that Wilson also exhibited consciousness of guilt when she did the following during an interview on May 26:
(1) Denied knowing White by name.
(2) Failed to mention that she had indirect contact with White at the Lake Guntersville State Park.
From an examination of this evidence, I cannot conclude that these actions or inactions evidenced a consciousness of guilt reasonably tending to connect Wilson's with the offense charged. I cannot say that these actions or inactions are related to the offense. To do so would amount to no more than pure speculation. While the Wilson's failure to disclose to the police that she had indirect contact with White approximately a week before the murder raises some suspicion, it is not of such "substantive character" as to connect Wilson with a crime that occurred approximately a week later. As a final note, I point out that Wilson did not deny knowing White as the state contends. When the appellant was asked if she knew White, she said "who" and then immediately said, "Oh, you mean Mr. Carpenter [obviously referring to White]."
In addition to the evidence that falls within the four general categories discussed above, *476 the state sought to use numerous telephone records as corroborative evidence. These records in and of themselves, showing only that telephone calls were placed, do not corroborate White's testimony. Without White's testimony as to the content of these telephone calls, there is nothing in the telephone records that tends to connect Wilson with the crime charged. See Mills v. State, 408 So.2d 187 (Ala.Cr.App.1981); McCoy v. State, 397 So.2d 577 (Ala.Cr.App.) cert. denied, 397 So.2d 589 (Ala.1981).
I question the conclusion of the majority's opinion wherein it states, "The testimony of the guards at the park and the telephone records corroborate White's testimony that Wilson paid him to murder her husband." Eliminating the testimony of White, which is required in resolving this issue, the testimony of the guards and the telephone records referred to are not inconsistent with innocence and thus do not corroborate White's testimony. I further question the majority opinion's conclusion, "Considering Wilson's desire to rid herself of her husband, it is legitimate to infer that White obtained the money from Wilson." The inference found by the majority may in its consideration support the testimony of White but that is not the point. Here, we are concerned with accomplice corroboration which is all together a different thing. Finally, the majority's general conclusion that "The corroborative evidence detailed above in the facts was sufficient to connect appellant Wilson to the crime of hiring someone to kill Dr. Wilson." is incorrect. There is no evidence absent the testimony of White that tends to connect Wilson with the crime and that is inconsistent with innocence.
After reviewing all of the evidence presented by the state independent of White's testimony, including the evidence pertaining to Wilson's conduct within a reasonable time of the date of the offense, see Fuller v. State, I am compelled to conclude, in the light of the authorities cited, that the state fell short of producing evidence tending to connect Wilson with the crime. Much of the evidence presented by the state tended only to support White's version of the circumstances surrounding the commission of the crime without connecting or tending to connect Wilson with it. As I have stated, the rule is clear that an accomplice cannot corroborate himself. See Evans v. State, 42 Ala.App. 587, 172 So.2d 796 (1965). Most of the remaining evidence is either remote, lacks substance, is not inconsistent with innocence, goes only to motive, and/or does no more than raise suspicions of guilt. I find no inferences of sufficient probative value to establish corroboration of White's testimony. In conclusion, I find the following most appropriate for the evidence before us:
"[W]e find that the `fine line ... between corroborative evidence which does no more than raise a suspicion of guilt and evidence of such a nature that it tends to connect the defendant with the commission of the offense' has not been crossed over. Thompson [v. State,] 374 So.2d [388], 389 [(Ala.1979)]. The evidence in this case compels the same conclusion the Alabama Supreme Court reached in Sorrell, 249 Ala. at 292.
"`True, there are circumstances in this case which might be calculated to arouse the curious mind to wonder why they occurred, if defendant were wholly innocent of wrongdoing, but when considered in the light of the governing principles of law above deduced, it is clear the evidence was wanting in the legal requisites necessary to sustain the conviction. The conviction rested on surmise, speculation and conjecture, and the ends of justice require us to enter a reversal ...'
"If the rule that corroborative evidence must do more than raise a suspicion of guilt has any application, it is in this case. Suspicion cannot be heaped upon suspicion to create a reasonable inference of guilt."
McCoy v. State, 397 So.2d 577, 588 (Ala.Cr. App.1981). Thus, I am compelled to dissent because I do not believe that the prosecution's evidence independent of White's testimony corroborated White's testimony, and thus I believe that it did not meet the requirements of § 12-21-222. It is my opinion that the trial court's ruling denying Wilson's motion for judgment of acquittal constituted reversible error.

*477 ON APPLICATION FOR REHEARING

TAYLOR, Presiding Judge.
RULE 39(k) MOTION DENIED; APPLICATION FOR REHEARING OVERRULED.
McMILLAN, LONG[*], and COBB[*], JJ., concur.
PATTERSON, J., dissents with opinion.
PATTERSON, Judge (dissenting).
I dissent from the majority's decision to overrule the appellant's application for rehearing. I would grant rehearing in both cases, i.e., in Woods's conviction for murder for hire (CR-92-1223) and the denial of her petition for post-conviction relief, filed pursuant to Ala.R.Crim.P. 32 (CR-93-2132). In my opinion, the following considerations strongly support the granting of a rehearing: the lack of corroboration of the testimony of the accomplice, James White; the subsequent acquittal of the codefendant, who allegedly acted as a go-between in arranging the killing; the recantation of the testimony of the accomplice; and the question whether the trial court and the majority of this court gave proper weight to the recantation of White.
I also dissent from the majority's denial of the appellant's motion filed pursuant to Ala. R.App.P. 39(k). The facts set out in the opinion of this court are insufficient for a clear understanding of all the issues involved. I would grant the Rule 39(k) motion and adopt the appellant's proposed statement of facts.
I reaffirm my dissent heretofore filed in which I conclude that the state failed to corroborate the testimony of the accomplice, White, and that the motion for a judgment of acquittal should have been granted on that ground.
NOTES
[1] The appellant's motion for a change of venue was granted and the case was tried in Tuscaloosa County.
[2] Many of the witnesses who testified in this trial are members of Alcoholics Anonymous. In an effort to protect their identities in accordance with the goals of this organization, these witnesses will be referred to by their initials.
[3] Peggy Lowe, Betty Wilson's twin sister, and James Dennison White were also indicted for this capital offense. Before trial, the prosecutor and White executed a four-page contingent plea agreement. White agreed to provide "truthful and complete corroborating evidence ... substantiating the complicity and involvement" of Wilson and Lowe and to provide truthful testimony in the prosecutions of Wilson and Lowe. The prosecution, in return, agreed (contingent on White's full performance of his obligations) to recommend, after the resolution of the prosecutions of Wilson and Lowe, that White be allowed to plead guilty to the lesser offense of murder and be sentenced to life imprisonment. This agreement bears close scrutiny; it is arguable that such an agreement would encourage the commission of perjury. Subsequent to Wilson's trial, Lowe was tried and acquitted. White plead guilty to murder and was sentenced to life imprisonment. Since entering his plea and receiving his sentence, he has recanted his testimony and now contends that Wilson did not hire him to kill her husband, that he, before her trial, had no contact with her, and that to his knowledge, she was in no way involved in her husband's death.
[4] Dr. Wilson died from repeated blows to the head inflicted by a baseball bat and from stab wounds to the chest and the abdominal area.
[5] The majority opinion holds that Cerha's testimony was admissible "to show the appellant's intent and desire to kill her husband...." Furthermore, the majority opinion relies on § 44.02(1) of McElroy's Alabama Evidence, C. Gamble, (4th ed. 1990). This section states that a remote threat is admissible hearsay. It is my opinion that this statement is too remote to be considered corroborative of White's testimony.
[*] Although Judge Long and Judge Cobb were not members of this court when the original opinion was released on January 13, 1995, the entire record, the original opinion, and the briefs were made available for them for consideration on rehearing.